BONNIE A. CROWLEY, Plaintiff-Appellant, v. THE CITY OF BERWYN, Defendant-Appellee.

First District (4th Division)   No. 1—98—1955

Opinion filed June 30, 1999.

Paul R. O'Malley, of Chicago, for appellant.

Hartigan & Cuisinier, of Chicago (Russell W. Hartigan and Patrick H. O'Connor, of counsel), for appellee.

PRESIDING JUSTICE SOUTH delivered the opinion of the court:

This is a personal injury action arising out of a fire that occurred on August 2, 1992. Plaintiff was a resident of 2203 South Ridgeland Avenue, Berwyn, Illinois. The fire occurred in the early morning hours on that day and both the City of Berwyn and the Village of North Riverside responded to the call.

The trial court granted defendant's motion for summary judgment and motion to dismiss plaintiff's fifth amended complaint and ruled that the City of Berwyn had immunity pursuant to the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/1—101 et seq. (West 1994)).

The issues presented for review are: (1) whether the Tort Immunity Act provides immunity for the action of the City of Berwyn's fire department; (2) whether section 5—103 of the Tort Immunity Act provides immunity for a fire rescue attempt; (3) whether the special duty doctrine applies to this case; and (4) whether evidence exists giving rise to willful and wanton misconduct on the part of the City of Berwyn.

Officer Leilani Cappetta was the first of the emergency personnel to arrive on the scene, approximately one minute after the fire was called into dispatch. Upon arrival, she ran toward the exits of the building while a number of people were exiting the front doors. Officer Cappetta eventually found a way to the third floor, where she was met with extremely heavy smoke. She contemplated taking off her belt and crawling on her stomach along the third floor in order to alert residents but was prevented from doing so by another officer due to the extreme danger. When Officer Cappetta descended the stairwell, she came upon Berwyn firefighter Chief Pechous as he was ascending with a fire hose. Officer Cappetta noticed that Chief Pechous wore no helmet or breathing apparatus and felt that he was in danger and advised him to put on his hat. At that time, a burst of flames came toward them, and Officer Cappetta ran down the stairwell as another firefighter was coming up.

Officer Cappetta proceeded outside to speak to her sergeant and advised him that she had heard yelling from the third floor and was going to go to the rear of the building. She came upon Officer Reagan whom she told she heard a woman screaming for help, to which Officer Reagan responded: "I know she's up there." Officer Cappetta then ran to Ridgeland Avenue to notify the firemen that there was a rescue needed. She assisted the firemen in moving the ladder and carrying it to the rear of the building. The ladder was placed and plaintiff was rescued.

Officer Bojovic arrived on the scene almost immediately upon be-

ing dispatched. He entered the building and proceeded to the second floor and started pounding on doors. He then found his way to the third floor stairwell, where he met with Officer Cappetta. Smoke was very heavy and he began choking so he and Officer Cappetta proceeded back down the stairwell. He proceeded to the rear of the building, where he assisted in raising the ladder to rescue plaintiff. He did not observe the total rescue. ,

Edward Anderson arrived at the scene two or three minutes after the call came in. Lieutenant Considine, firefighter Rosiar and a policeman asked for his assistance in getting the ladder off the North Riverside truck. He assisted in removing the ladder from the North Riverside truck, and the group ran the ladder back to the alley. He did not observe plaintiff's rescue.

Firefighter Rosiar also recalls being approached by a police officer and told that a ladder was needed in the rear of the building. He assisted in running the ladder from the truck. He testified that they were going as fast as four people could handle a ladder. When they reached the alley, he noticed a man on a windowsill. He also saw plaintiff on the windowsill, but he saw no flames. He testified that North Riverside Chief Salvino was in charge of the rescue area. It was his understanding that whoever was the highest ranking commander of the area would be in charge of the scene and make a decision as to where to deploy a 35-foot ladder. Firefighter Rosiar testified that plaintiff was rescued before the elderly gentleman, who was also on the third floor, because she seemed to be in the most danger. The firefighters were acting on the instructions and commands of their supervisor. Firefighter Rosiar testified that there was so much smoke in the rear of the building that he was unable to see the entire window upon which plaintiff was sitting. As he climbed the ladder, he noticed that plaintiff was not attempting to place her foot upon the ladder and realized that he was going to have to carry her out of the window; however, the ladder was not high enough to reach the window where she sat. He then told the plaintiff to wait as he descended the ladder, repositioned it, extended it to the windowsill and went up the ladder a second time.

Firefighter Considine recalls that, upon his arrival at the scene, he was approached by a police officer advising him of a rescue at the rear of the building. He gathered his crew together, and they removed a 35-foot extension ladder from the North Riverside ladder truck. When they arrived at the rear of the alley, they saw plaintiff perched on the third-floor window sill. They raised the ladder and Officer Rosiar climbed the ladder and attempted to rescue plaintiff. Officer Rosiar thought that plaintiff froze and that she did not want to get onto the

ladder. The ladder was repositioned, and he was able to coax her out of the building and onto the ladder. As plaintiff was coming down the ladder, Firefighter Rosiar attempted to comfort her by telling her "one step at a time, take your time, we've got an ambulance coming." Following plaintiff's rescue, they then rescued the elderly gentleman. He testified that plaintiff was the first person rescued.

Upon his arrival at the scene, Chief Pechous entered the building with another firefighter and a hose. At that point, they were under the assumption that the fire was contained in only one apartment. The fire turned out to be a "three-box alarm fire" and there were probably about nine engines and four trucks on the scene within 20 minutes.

At the time of the occurrence, North Riverside and Berwyn had entered into a mutual aid assistance agreement for mutual assistance in a fire or other emergency. North Riverside, specifically, Chief Dominic Salvino, appeared on the scene pursuant to those provisions of the agreement.

Chief Salvino arrived at the rear of the building at approximately the same time the firemen were bringing a 35-foot ladder for rescue purposes. There were two people hanging out of the windows. The first individual was completely obscured by the smoke. He took command of the area at the rear of the building upon his arrival and plaintiff's rescue was attempted first. At that time, she had her legs hanging out of the window. They were not able to effectuate plaintiff's rescue with the initial placement of the ladder and, therefore, repositioned it and pushed it closer to the window sill. He then ordered Lieutenant Considine of the Berwyn fire department to go up the ladder and assist plaintiff. He stated that had the ladder been placed any higher initially, it would have pinned plaintiff's legs against the building. Plaintiff also seemed to be frozen on the window sill. From the time when they initially noticed plaintiff upon the windowsill and the ladder was originally placed, until plaintiff was safely on the ground, took approximately 1½ to 2 minutes. The only delay was caused by plaintiff, because, he testified, she could have gotten onto the ladder at its initial placement.

Plaintiff testified that on the night of the fire she was asleep when she became aware of the fire because of her apartment filling with smoke. She wears glasses and did not put them on when she was awakened by the smoke. She testified that she panicked when she saw the smoke and ran from room to room trying to get fresh air. She spent one or two minutes trying to locate somebody outside and finally located some people outside the window, at which time she screamed for help. During the fire, she climbed out on her window ledge because it was unbearable in her apartment. A ladder was initially put up to

her but did not reach her. Her left arm and hand were severely burned, which impeded her attempt to reach the ladder. Plaintiff testified that the ladder was initially placed approximately 12 inches below her window sill.

Plaintiff contends that section 2—201 of the Tort Immunity Act (745 ILCS 10/2—201 (West 1994)) does not apply to frontline firefighters. Defendant responds that it does because firefighters must exercise their best judgment or discretion in where and how to rescue individuals.

■ The Local Governmental and Governmental Employees Tort Immunity Act (Act) governs whether and in what situations local governmental units are immune from civil liability. *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 340, 692 N.E.2d 1177, 1180 (1998). Under the Act, a public employee may be granted immunity if he holds a position involving either the determination of policy or exercise of discretion, but immunity will not attach unless plaintiff's injury results from an act performed or omitted by the employee that is both a determination of policy and an exercise of discretion. *Harinek*, 181 Ill. 2d at 340-41, 692 N.E.2d at 1180-81.

Section 2—201 of the Act provides as follows:

"Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILCS 10/2—201 (West 1994).

■ This section provides for immunity of a firefighter who is exercising his judgment and discretion even when that discretion is abused. Plaintiff argues that, as a frontline firefighter, firefighter Rosiar had to act in a particular manner in placing ladders or making rescues but has not specified what this particular manner would be. In effect, plaintiff alleges that firefighter Rosiar's actions were purely ministerial. However, a firefighter on the frontline of firefighting and rescue would be more likely to use his or her discretion in determining how the rescue should be made, the placement of the ladders, whom to rescue first, etc. Such decisions call for the training and judgment of the firefighter, which would not be of a ministerial nature. Extinguishment of fires and rescues cannot be effectuated in the same manner for every fire, since fires are unpredictable. Discretion on the part of firefighters is necessary.

We find that since the actions that firefighter Rosair took involved a determination of policy and an exercise of discretion, section 2—201 of the Act applies.

■ Plaintiff argues that section 5—103 of the Act does not provide immunity for the actions of defendant because while this section provides for firefighting it does not apply to the rescue of persons from a fire. Defendant responds that this argument is without merit since fighting a fire includes the rescue of persons in danger.

Section 5—103 of the Act states in pertinent part:

"(a) Neither a local public entity, nor a public employee acting in the scope of his employment, is liable for an injury resulting from the condition of fire protection or firefighting equipment or facilities. Nothing in this section shall exonerate a public entity from liability for negligence by reason of the condition of a motor vehicle while it is traveling on public ways.

(b) Neither a local public entity nor a public employee acting in the scope of his employment, is liable for an injury caused by an act or omission of a public employee while engaged in fighting a fire. However, this Section shall not apply if the injury is caused by the willful and wanton conduct of the public employee." 745 ILCS 10/5—103 (West 1994).

It is clear that the term "firefighting" must include rescue services. In fact, article V of the Act includes rescue service in the term "firefighting." This court should not adopt plaintiff's narrow reading of the term "firefighting." To do so would undermine the purpose of the Act. See *McGuckin v. Chicago Union Station*, 191 Ill. App. 3d 982, 548 N.E.2d 461 (1989).

Plaintiff asserts that the City of Berwyn owed a "special duty" to her to protect her from the injuries that she suffered. Defendant responds that the special duty doctrine does not apply because the Act immunized the City of Berwyn from liability for plaintiff's injuries. In addition, defendant argues that even if the Act did not apply, plaintiff still would not have shown that defendant owed a special duty to her.

■ The special duty doctrine is an exception to the Local Governmental and Governmental Employees Tort Immunity Act. *Downey v. Wood Dale Park District*, 286 Ill. App. 3d 194, 199, 675 N.E.2d 973, 978 (1997). The special duty doctrine applies where the municipality, or its agent, has a special relationship with plaintiff that creates a duty different from that owed to the general public. *Downey*, 286 Ill. App. 3d at 203, 675 N.E.2d at 980. For the special duty exception to apply: (1) a municipality must be uniquely aware of a particular danger or risk to which plaintiff is exposed; (2) there must be specific acts or omissions on the part of the municipality; (3) the specific acts must be affirmative or willful in nature; and (4) injury must occur while plaintiff is under the direct and immediate control of employees or agents of the municipality. *Lawson v. City of Chicago*, 278 Ill. App. 3d

628, 637, 662 N.E.2d 1377, 1384 (1996). The mere fact that a municipality is aware of another's need for protection does not give rise to a conclusive finding of direct and immediate control required for application of the special duty exception. *McGuckin*, 191 Ill. App. 3d at 993, 548 N.E.2d at 468. The question of whether the City owed plaintiff a duty under the special duty doctrine had no bearing on the separate question of whether the Act immunizes the City from liability for plaintiff's injuries; the existence of a duty and the existence of an immunity are separate issues. *Harinek*, 181 Ill. 2d at 346, 692 N.E.2d at 1183. The special duty doctrine may not operate to impose liability upon a public entity after a court has found that entity immune from liability under the Tort Immunity Act. *Harinek*, 181 Ill. 2d at 347, 692 N.E.2d at 1183-84.

■ Since the court has determined that the Act immunizes defendant, the special duty doctrine, under *Harinek*, does not apply.

However, even if this court should rule that it would apply, plaintiff would be unable to satisfy the four elements of the special duty doctrine. With respect to the municipality being uniquely aware of the risk of danger to plaintiff, plaintiff must allege a specific risk of imminent injury and actual knowledge that a particular person was in danger. Here, there was nothing unique about defendant's awareness of the danger to plaintiff; the public at large was aware of the danger. Thus, plaintiff failed to satisfy the first element.

The second element requires plaintiff to make specific allegations of acts or omissions on the part of the municipality. Plaintiff failed to make such allegations. Thus, plaintiff cannot satisfy the second element of the special duty doctrine.

The third element requires that the specific acts or omissions alleged be either affirmative or willful in nature. Plaintiff alleges that defendant either failed to properly rescue her or did not rescue her fast enough. This does not satisfy the third element.

Finally, the fourth element that the injury must occur while plaintiff was under the direct and immediate control of employees or agents of the municipality is also not satisfied by plaintiff. To satisfy this requirement plaintiff must show that the public employee initiated the circumstances that created a dangerous situation. *Downey*, 286 Ill. App. 3d at 205, 675 N.E.2d at 982. The City of Berwyn did not create the fire that led to plaintiff's need for rescue. Thus, plaintiff could not satisfy the fourth element. Therefore, under an analysis of the special duty doctrine, plaintiff would not prevail.

■ Plaintiff contends that the actions of defendant were willful and wanton based on the City's unreasonable delay in the rescue of plaintiff and its delay in assessing the need to perform rescues in the

rear of the building. Defendant responds that there is no evidence of any willful and wanton conduct on the City's part. In addition, defendant argues that plaintiff's entire complaint is based upon an alleged failure to perform discretionary acts and is therefore subject to section 2—201 immunity.

Even willful and wanton conduct cannot deprive a municipality of immunity granted by the Act. *Harinek*, 181 Ill. 2d at 347, 692 N.E.2d at 1184. Discretionary acts such as those of the firefighters in this case are subject to immunity under section 2—201 of the Act; thus, this court need not consider whether the alleged conduct was willful and wanton.

Affirmed.

HOFFMAN and HALL, JJ., concur.